UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

**FILED**

**MAR 03 2016**

CLERK

| | |
|---|---|
| ROBERT A. HORSE, | 4:14-CV-04137-LLP |
| Plaintiff, | |
| vs. | ORDER GRANTING MOTION FOR SUMMARY JUDGMENT, DENYING MOTION TO APPOINT COUNSEL, AND DENYING MOTION FOR PROTECTIVE ORDER |
| WARDEN DARIN YOUNG, South Dakota Penitentiary; and CABINET SECRETARY DENNIS KAEMINGK, South Dakota Department of Corrections, | |
| Defendants. | |

### INTRODUCTION

Plaintiff, Robert A. Horse, filed this lawsuit pursuant to 42 U.S.C. § 1983, claiming that defendants violated his constitutional rights. He is an inmate at the South Dakota State Penitentiary (SDSP) in Sioux Falls, South Dakota. After his due process claim survived 28 U.S.C. § 1915A screening, Horse moved this Court to appoint counsel. Docket 21. Defendants now move for summary judgment as well as an order protecting them from Horse's discovery requests. Docket 23; Docket 24. For the reasons below, the Court grants defendants' motion for summary judgment and denies all other motions as moot.

### FACTUAL BACKGROUND

Horse has been involved in the Native American Council of Tribes (NACT) for the past ten years, including three terms as president. Docket 29 at ¶¶ 1,

3. On April 16, 2014, the NACT held a meeting at SDSP. *Id.* at ¶ 6. An NACT member complained about the leadership, including Horse, during this meeting. *Id.* at ¶¶ 7, 18. According to Horse's affidavit, these complaints are common. *Id.* at ¶ 8. Later the same day, the inmate who spoke out during the meeting was assaulted in the East Hall shower room. Docket 25-1 at ¶ 6.

Prison officials investigated the assault over the next several days. Docket 1-1 at 1. Chad Rotert, who works for the "Special Investigations Unit" or "Special Security" at SDSP, personally investigated the assault. Docket 25-1 at ¶¶ 1-2, 5. Though a Lieutenant now, Rotert was a Sergeant at the time of the investigation. *Id.* at ¶¶ 1, 4.

During his investigation, Rotert "received and reviewed a variety of information, spoke with confidential informants, and reviewed numerous kites . . . ." *Id.* at ¶ 7. The information implicated Red Brotherhood gang members and Horse. *Id.* at ¶ 8. Rotert found the information reliable: the kites corroborated each other, and he had interacted with the informants (CIs) in the past. *Id.* at ¶¶ 10-12. Rotert also reviewed the minutes of the NACT meeting because his investigation suggested the assualt was related to the meeting. *Id.* at ¶¶ 15, 17. The alleged victim spoke to Horse, however, and told Horse that the altercation in the shower was a fight, rather than an assault, and was unrelated to the NACT meeting. Docket 29 at ¶ 17.

Rotert compiled a disciplinary report with a description of the incident. Docket 25 at ¶ 32; Docket 1-1 at 1. Based on this report, the DOC charged Horse with two rules violations: L-41 and L-45. L-41 prohibits "Conduct which

2

disrupts or interferes with the security of good order of the institution or interfering with a staff member in the performance of his/her duties including circumventing or attempting to circumvent any rule, regulation or procedure contained in DOC policies or institutional operational memorandums." Docket 1-1 at 1; South Dakota Department of Correction Inmate Living Guide, revised March 2013, p. 17, *available at* https://doc.sd.gov/documents/adult/ InmateLivingGuide-2013.pdf. L-45 prohibits "Engaging in gang organization, recruitment or blatant displays of gang activity or materials related to security threat groups." *Id.*

On April 29, 2014, the Disciplinary Hearing Officer (DHO) found Horse guilty. Docket 1-1 at 2. Although he was allowed to present witness testimony or evidence, Horse presented neither. *Id.* The evidence supporting the DHO's decision included Rotert's report, evidence from CIs, Horse's statement, and numerous kites. *Id.* The DHO sentenced Horse to ninety days in disciplinary segregation and ordered him to pay a $100 fine. *Id.*

Horse appealed. Docket 1-1 at 3. He attacked the legitimacy of the kites and the CI's information, arguing that he had been set up by NACT members vying to seize his position as president. *Id.* As relief, Horse requested the DOC expunge the violations from his record, give him a polygraph test to prove his innocence, and allow him an opportunity to prove the falsity of the kites and CIs' information. *Id.* These requests were denied. *Id.* Horse fully exhausted his grievance to no avail. Docket 1-1 at 6-8.

3

On September 2, 2014, Horse filed this complaint. Docket 1. He argues that defendants violated his First, Fifth, Eighth, and Fourteenth Amendment rights. *Id.* at 3. The crux of his complaint is the same as his administrative appeal: defendants relied on fabricated evidence to convict him. *Id.* at 4. He produced a litany of actions prison officials fail to do. *Id.* These included evaluating kites and informants, taking into account investigations in the past where he was proved to be innocent, giving him a polygraph test, and taking into account the internal politics of the NACT and his position in the group. *Id.* He also complained that the disciplinary report marked him as a gang member, a fact that will affect his parole eligibility even though it is untrue. *Id.* In relief, Horse requests that the violations be expunged from his record. *Id.* at 3.

United States Magistrate Judge Veronica L. Duffy screened Horse's complaint under 28 U.S.C. § 1915A, and recommended it be dismissed for failure to state a claim upon which relief may be granted pursuant to §§ 1915A(b)(1) and 1915(e)(2)(B)(ii). Docket 9. Horse objected, arguing he had stated a due process claim because prison officials did not evaluate the credibility of the CIs or kites. Docket 10. This Court held Horse had stated a claim that his curtailed confrontation right in a prison disciplinary proceeding was violated by the information relied upon in his hearing. Docket 11 at 2. The question of whether Horse has a liberty interest under Eighth Circuit case law was left unanswered, and the Court granted Horse's objection in part, dismissed his claims except under the Due Process Clause, and ordered defendants to respond to the complaint. *Id.* at 3-4.

4

The deadline for discovery was set for July 15, 2015. Docket 20. On July 9, 2015, Horse sent a discovery request to defendants' counsel seeking a number of documents. Docket 23-2. Defendants move this Court to rule that Horse's request is untimely and grant a protective order. Docket 23. Horse also moves this court appoint him counsel. Docket 21.

On August 28, 2015, defendants moved for summary judgment. Docket 24. Horse responded, Docket 27, and defendants replied. Docket 30. On November 2, 2015, defendants amended their reply, retracting their qualified immunity argument but arguing they were entitled to summary judgment on the merits. Docket 34.

## LEGAL STANDARD

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is appropriate where the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The court must view the facts, and inferences from those facts, in the light most favorable to the nonmoving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962)); *Helton v. Southland Racing Corp.*, 600 F.3d 954, 957 (8th Cir. 2010) (per curiam). Summary judgment will not lie if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Stuart C. Irby Co. v. Tipton*, 796 F.3d 918, 922 (8th Cir. 2015).

The burden is placed on the moving party to establish both the absence of any genuine issue of material fact and that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). Once the movant has met its burden, the nonmoving party may not simply rest on the allegations in the pleadings, but must set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists. *Anderson*, 477 U.S. at 256; Fed. R. Civ. P. 56(e).

The underlying substantive law identifies the facts that are "material" for purposes of a motion for summary judgment. *Anderson*, 477 U.S. at 248. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* (citing 10A Charles A. Wright, Arthur R. Miller & Mary Kay Kane, Fed. Practice & Procedure § 2725, at 93–95 (3d ed. 1983)). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Id.* at 247–48.

Essentially, the availability of summary judgment turns on whether a proper jury question is presented: "The inquiry performed is the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id.* at 250. Though pro se litigants such as Coon are entitled to a liberal

6

construction of their pleadings, Rule 56 remains equally applicable to them.
*Quam v. Minnehaha Co. Jail*, 821 F.2d 522, 522 (8th Cir. 1987).

## DISCUSSION

Only Horse's procedural due process claim survives. "The Fourteenth
Amendment's Due Process Clause protects persons against deprivations of life,
liberty, or property; and those who seek to invoke its procedural protection
must establish that one of these interests is at stake." *Wilkinson v. Austin*, 545
U.S. 209, 221 (2005). To state a procedural due process claim arising out of
prison discipline, a prisoner must establish either (1) that he has a liberty
interest protected by the due process clause itself or (2) that he has a liberty
interest created by state-law and the prison action "imposes atypical and
significant hardship on the inmate in relation to the ordinary incidents of
prison life." *Sandin v. Conner*, 515 U.S. 472, 484 (1995).

In *Vitek v. Jones*, 445 U.S. 480 (1980), the Court found a prisoner had a
liberty interest in avoiding an involuntary transfer to a mental institution that
was protected by the Due Process Clause itself. Jones argued his medical
treatment was nonconsensual, and he suffered from "the stigmatizing
consequences" of the determination that he was mentally ill. *Id.* at 486. The
Court found that prisoners retain "a residuum of liberty" even after
incarceration, and the "loss of liberty produced by an involuntary commitment
is more than a loss of freedom from confinement." *Id.* at 491-92. This loss of
liberty required the state to provide due process protections.

A number of factors led the Court to this decision. The Court explained that "commitment to a mental hospital 'can engender adverse social consequences to the individual' and that '[w]hether we label this phenomena stigma or choose to call it something else . . . we recognize that it can occur and that it can have a very significant impact on the individual.' " *Id.* at 492 (quoting *Addington v. Texas*, 441 U.S. 418, 425-26 (1979)). The fact that the right to be free from "unjustified intrusions on personal security" is an "historic liberty" protected by the due process clause was another factor the Court considered. *Id.*

The Court also explained the differences in punishments, stating that the consequences of involuntary commitment are "qualitatively different from the punishment characteristically suffered by a person convicted of crime." *Id.* at 493. Simply, commitment to a mental hospital "is not within the range of conditions of confinement to which a prison sentence subjects an individual." *Id.* (citations omitted). The Court explained that each restriction placed on an involuntarily committed prisoner may not be enough to constitute a deprivation of a liberty interest, but "the stigmatizing consequences of a transfer . . . coupled with the subjection of the prisoner to mandatory behavior modification as a treatment for mental illness" constituted a liberty deprivation and required due process protection. *Id.* at 494.

In *Wilkinson*, the Supreme Court analyzed whether the procedures Ohio used to determine prisoners' security classification provided sufficient procedural protection to comply with due process requirements. First, the

Court found that prisoners had a liberty interest in avoiding assignment to a prison facility with more restrictive conditions of confinement because it imposed an atypical and significant hardship. *Id.* at 223. The Constitution itself did not give Ohio prisoners the right to avoid transfers or assignments to more secure facilities, but prisoners incarcerated in the supermax prison, Ohio State Penitentiary (OSP), suffered an atypical and significant hardship and therefore had a liberty interest in avoiding this assignment. *Id.* at 224.

The Court applied *Sandin.* "[T]he touchstone of the inquiry into the existence of a protected, state-created liberty interest in avoiding restrictive conditions of confinement is . . . the nature of those conditions themselves 'in relation to the ordinary incidents of prison life.'" *Id.* at 223 (quoting Sandin, 515 U.S. at 484). The Court found the conditions in OSP so onerous that they created an "atypical and significant hardship." *Id.* at 223-24. For those incarcerated in OSP, human contact was prohibited, the cell light was kept on 24 hours a day, and exercise was limited to one hour per day in a small, indoor room. *Id.* Still, prisoners in most solitary confinement facilities would experience these conditions. *Id.* at 224.

What made the OSP conditions so onerous was the duration of the placement and the effect on parole eligibility. *Id.* Unlike temporary placements that do not give rise to liberty interests, placement at OSP was indefinite and reviewed only once a year. *Id.* Placement at OSP also disqualified prisoners from parole consideration even if they were otherwise eligible. *Id.* Taken

9

together, these conditions imposed an "atypical and significant hardship" on prisoners incarcerated at OSP. *Id.*

Construed liberally, Horse's complaint raises four grounds for establishing a liberty interest: the time in disciplinary segregation, the change to maximum security classification, the damage to his parole eligibility, and the inherent stigma of being labelled a gang-member in prison.

## I.    **Time in Disciplinary Segregation**

Construed liberally, Horse's complaint alleges he has a protected liberty interest in avoiding serving time in disciplinary segregation. To establish a liberty interest, Horse must show that his punishment constituted a change in the condition of his confinement that "work[ed] such major disruptions in [his] environment and life . . . present[ed] dramatic departures from the basic conditions and ordinary incidents of prison sentences." *Moorman v. Thalacker*, 83 F.3d 970, 972 (8th Cir.1996).

The Eighth Circuit routinely holds that a transfer to segregated confinement is not an "atypical and significant hardship" that creates a protected liberty interest. *See Orr v. Larkins*, 610 F.3d 1032, 1034 (8th Cir. 2010) (holding prisoner was not deprived of a liberty interest during nine months in administrative segregation); *Portley–El v. Brill*, 288 F.3d 1063, 1065 (8th Cir. 2002) (holding thirty days in punitive segregation and initial maximum security classification was not an "atypical and significant hardship"); *Phillips v. Norris,* 320 F.3d 844, 847 (8th Cir. 2003) (holding denial of visitation, exercise privileges, and religious services during 37 day

10

segregation did not give rise to a protected liberty interest); *Freitas v. Ault,* 109 F.3d 1335, 1338 (8th Cir.1997) (holding transfer that resulted in ten days of administrative segregation and thirty days of "on-call" status did not constitute an "atypical and significant hardship"); *Howard v. Collins,* 129 F.3d 121 (8th Cir. 1997) (unpublished) (holding eight months in administrative segregation, standing alone, was not an atypical and significant hardship in relation to the ordinary incidents of prison life); *Kennedy v. Blankenship,* 100 F.3d 640, 642 n. 2, 643 (8th Cir.1996) (holding punitive isolation was not an atypical and significant deprivation even though prisoner faced restrictions on mail, telephone access, visitation, and commissary privileges).

Viewing the facts in the light most favorable to Horse, the Court finds that, as a matter of law, his punishment of 90 days in disciplinary segregation does not establish a protected liberty interest.

## II. Maximum Security Classification

Construed liberally, Horse's complaint alleges he has a protected liberty interest in avoiding classification as a maximum security prisoner. As explained above, a change in the condition of confinement implicates a liberty interest only when the action creates deprivations "which work such major disruptions in a prisoner's environment and life that they present dramatic departures from the basic conditions and ordinary incidents of prison sentences." *Moorman,* 83 F.3d at 972.

"[T]he Due Process Clause does not give an inmate a liberty interest in remaining in the general population." *Seltzer-Bey v. Delo,* 66 F.3d 961, 964

11

(8th Cir. 1995). There is no liberty interest in assignment to a particular unit of a prison. *Moorman*, 83 F.3d at 973; *Carney v. Houston*, 33 F.3d 893, 894 (8th Cir. 1994). Prisoners do "not have a constitutional right to a particular prison . . . classification." *Sanders v. Norris*, 153 Fed. App'x. 403, 404 (8th Cir. 2005). "[C]onstitutionally speaking, assignments are discretionary, so long as they are not done for prohibited or invidious reasons and do not rise to independent constitutional violations on their own weight." *Moorman*, 83 F.3d at 973. Therefore, Horse's re-classification as a maximum security prison does not establish a liberty interest.

The Supreme Court has held that the conditions of a maximum security facility are so onerous that classification that leads to incarceration in this facility establishes a liberty interest under the Due Process Clause. *See Wilkinson*, 545 U.S. 209 (explained above). The Eighth Circuit has suggested that being confined in maximum security conditions for an indefinite period of time may result in an atypical and significant hardship, giving rise to a liberty interest. *See Portley-El v. Brill*, 288 F.3d 1063, 1065-66 (8th Cir. 2002). Neither Horse's complaint nor any of his subsequent filings explain why his maximum security status is so onerous or indefinite that it establishes a liberty interest.

Viewing the facts in the light most favorable to Horse, the Court finds that, as a matter of law, his re-classification as a maximum security prisoner does not establish a protected liberty interest.

12

## III.  Possibility of Parole

Horse's complaint alleges that he has a protected liberty interest in his parole eligibility. Violations of prison rules are noted in inmate records that the warden maintains. *See* SDCL 24-15A-5. The warden may modify or revise an inmate's record. *Id.* This record is used to determine an inmate's compliance with their individual program directive at their initial parole date, and may also be used by the parole board in subsequent determinations of discretionary parole release. *Id.*; SDCL 24-15A-35. If the warden reports that an inmate has "not substantively complied with the individual program directive" at the inmate's initial parole date, the inmate must have a hearing with the board, which determines compliance with the individual program directive. SDCL 24-15A-39. The parole board may choose to grant or deny release at that time. *Id.*

To make this and other decisions concerning compliance with prison rules, the board considers a number of standards laid out in the procedural rules for parole release. *See* SDCL 24-15A-39; SDCL 24-15A-42. Under South Dakota Law:

[T]he board shall utilize the following standards in determining if the inmate has substantively met the requirements for parole release at the initial parole date:
(1) The inmate's compliance with work, school, and program directives;
(2) The inmate's compliance with the rules and policies of the department;
(3) Conduct by the inmate evincing an intent to reoffend; and
(4) Mitigating factors impacting the warden's determination of substantive noncompliance.

13

SDCL 24-15A-42. The board may use subdivisions (1)-(3) in discretionary
parole decisions. *Id.*

Defendants argue that, like the plaintiff in *Sandin,* Horse's disciplinary
record will not "inevitably affect the duration of his sentence." *Sandin,* 515 U.S.
at 487; *see also Wilkinson,* 545 U.S. at 224 (automatic disqualification from
parole is a factor in finding an "atypical and significant hardship"). In *Sandin,*
the Supreme Court found that nothing in the state-law *required* the parole
board to deny parole because of the prisoner had violated prison rules or grant
parole because of a lack of violations. *Id.* (citing Haw. Rev. Stat. §§ 353-68,
353-69 (1985); Haw. Admin. Rule § 23-700-33(b)). The chance that the
violation would result in denial of parole was "simply too attenuated to invoke
the procedural guarantees of the Due Process Clause" because the decision
rested "on a myriad of considerations," and the prisoner was "afforded
procedural protection at his parole hearing in order to explain the
circumstances behind his misconduct record." *Id.* (citing Haw. Admin. Rule
§§ s23-700-31(a), 23-700-35(c), 23-700-36 (1983)).

Here, that is not the case. True, Horse will not be denied parole
automatically because of his disciplinary record. The parole decision is based
on a myriad of considerations, and Horse will receive a hearing if the warden
decides that he has not complied with his individual program directive. SDCL
24-15A-42; SDCL 24-15A-39. But, under SDCL 24-15A-38, parole is
mandatory. The parole board is allowed "no discretion: inmates *shall* be

14

granted parole if their program directives have been met." *Bergee v. S. Dakota Bd. of Pardons & Paroles*, 608 N.W.2d 636, 643.

According to Horse's complaint, he would be eligible for automatic parole if he was not disciplined. If, while incarcerated, Horse has complied with work, school, and program directives, complied with the rules and policies of the department, and conducted himself in a way that evinces an intent to reoffend except for the matter at hand, then a violation would prevent him from being automatically paroled at his initial parole date in and of itself. This factor is not merely one in a myriad of factors.

Horse, however, has not been denied parole. His initial parole date has not come. The Eighth Circuit has held that a prisoner in Horse's position lacks standing to challenge a parole board's decision. In *Peck v. Battey*, 721 F.2d 1157 (8th Cir. 1983), the court upheld a finding that Peck, a prisoner who was not eligible for parole at the time he filed his complaint, lacked standing to bring his case. Without the "direct injury" of parole denial, Peck merely alleged he would eventually be up for parole. *Id.* at 1159. The court dismissed this claim. *Id.* at 1159-60.

Even if Horse had been denied parole, it is not clear his claim would be cognizable under § 1983. Because he would be seeking to be released from prison, his claim would likely be dismissed because he must file a § 2254 claim for habeas relief rather than a § 1983 civil rights claim. *See Heck v. Humphrey*, 512 U.S. 477 (1994).

15

Viewing the facts in the light most favorable to Horse, the Court finds that, as a matter of law, he has not shown that a possible protected liberty interest in parole has been violated.

## IV. Stigmatization

Horse's complaint alleges he has a protected liberty interest in avoiding the stigma attached to his designation as a gang member in prison. Docket 27 at 8. He claims this designation will have a negative effect on his parole eligibility, and prison officials will use it against him in the future. *Id.*

Defendants argue that his claim fails to raise a liberty interest. Docket 25 at 7. Defendants first argue that the violations do not designate him as a gang member. They argue L-45 only "requires that an individual is 'engag[ed] in gang organization,' it does not automatically tag an inmate as a gang member." *Id.* The Court disagrees. For all practical purposes, L-45 identifies Horse as a gang member. If any relevant person has in depth knowledge of the way in which the rule was applied to Horse, they are unlikely to use it. It is therefore not of use to Horse. The Court finds, for purposes of his claim, that Horse's violations designate him as a gang member.

Defendants also argue that Horse did not suffer hardship due to this designation. *Id.* Because he has only claimed that this identification will hurt his chances at parole, the resulting stigmatization fails to establish a liberty interest. *Id.* They argue that

> [T]he involuntary commitment to a mental institution "constituted a major change in the conditions of confinement amounting to a 'grievous loss[.]'" Horse has alleged no facts to support that his supposed labeling as a gang member has resulted in a major change in the conditions of his confinement. Thus, Horse's alleged constitutional violations fail.

16

*Id.* at 8 (quoting Vitek, 445 U.S. at 488).

Horse cites *Gwinn v. Awmiller*, 354 F.3d 1211 (10th Cir. 2004), arguing that the "stigma plus" standard should apply. The Eighth Circuit applied the "stigma plus" standard in *Gunderson v. Hvass*, 339 F.3d 639 (8th Cir. 2003). Gunderson, a prisoner, was forced to register as a predatory sex offender even though he had not been convicted of a predatory offense. He argued that this registration violated his procedural due process rights. *Id.* at 642. The court stated the stigma plus standard:

> Damage to reputation alone, however, is not sufficient to invoke the procedural protections of the due process clause. The loss of reputation must be coupled with some other tangible element to rise to the level of a protectible [sic] property interest. Sometimes this is referred to as the "stigma plus" test.

*Id.* at 644 (citations omitted).

The Court found characterization as a sexual predator stigmatizing, but Gunderson also needed show a tangible burden as a result of this stigma. He presented two arguments. First, he presented an argument under a Second Circuit case. *Id.* This argument is inapplicable because this case is no longer good law, and his argument interpreted an unrelated state privacy law. *Id.* Second, Gunderson argued the burden of registering satisfied the tangible element of the "stigma plus" standard. *Id.* The court disagreed. *Id.* It found that providing initial information and the ongoing obligation to update this information constituted a minimal burden that did not satisfy the "stigma plus" standard. *Id.* at 644-45 (quoting *Boutin v. LaFleur*, 591 N.W.2d 711, 718 (Minn. 1999)).

17

Under *Gunderson*, Horse's argument fails to satisfy the "stigma plus" standard. His designation as a gang member has not burdened him at all. He claims that this designation will make parole more difficult to obtain, and prison officials will be able to use it against him. Both things have not yet occurred and therefore do not burden Horse.

*Gwinn* does not support Horse's argument. While discussing a previous case that the holding in *Gwinn* is based on, the Tenth Circuit noted "that it was the loss of the previously granted opportunity to earn good time credits at a higher level, combined with his classification as a sex offender, that implicated a liberty interest." *Gwinn*, 354 F.3d 1211, 1217 (10th Cir. 2004) (citing *Chambers v. Colorado Dep't of Corr.*, 205 F.3d 1237, 1242 (10th Cir. 2000)). Even if designation as a gang member was the same as that of a sex offender, Horse does not allege that he has been denied parole based on this designation, only that he may be denied in the future.

Even without applying the "stigma plus" standard, Horse's claim fails. Other Eighth Circuit cases imply Horse's claim must fail because he cannot show negative consequences of the stigmatization.

In *Rem v. U.S. Bureau of Prisons*, 320 F.3d 791 (8th Cir. 2003), the Eighth Circuit decided not to issue a declaratory judgment that a federal notification law violated procedural due process. Rem, a prisoner, argued he was "subject to 18 U.S.C. § 4042(b) (enacted in 1994), which require[d] that state and local law enforcement be notified in writing of the release of a person convicted of a drug trafficking crime or a crime of violence." *Id.* at 793. The Court dismissed the due process claim because Rem had "no protected liberty interest in his reputation alone or in his classification as a drug trafficker." *Id.*

18

at 794. The Court specifically stated that this situation was different than that of a sex offender because there was no registration requirement, and "Notification alone does not constitute a change in legal status that implicates a liberty interest." *Id.*

Even if *Gwinn* supported Horse, his argument fails under *Rem.* His case is more similar to Rem's. The classification as a drug trafficker is similar to that of a gang member, and the court found it different than a classification requiring registration. *Id.* Horse's case is slightly different because he is being designated as a gang member while incarcerated. But, he still does not show how the designation has effected more than his reputation at this time.

In *Doe v. Fine*, No. CIV. 4-85-95, 1987 WL 18101 (D. Minn. Oct. 9, 1987), the Minnesota district court discussed *Vitek.* In *Vitek*, it explained, the Supreme Court "relied substantially on the 'stigma attached to a commitment and the behavioral modification procedure utilized at the facility.' " *Id.* at *3 (quoting *United States v. Jones*, 811 F.2d 444, 448 (8th Cir. 1987)). Vitek was committed "for a long and indefinite period of time to an actual mental hospital[, and] . . . was required to undergo mental evaluation and behavior modifying treatment." *Id.* (citing *Vitek*, 445 U.S. at 488).

The situation in *Doe* was "simply not analogous" to *Vitek. Id.* The plaintiff was "merely transferred, within the same facility, by dint of his peculiar behavior and his own failure to take his medications, to a more restricted environment for medical and psychological observation." *Id.* These differences made *Vitek* inapplicable, and the court found that "the due process clause itself provides no liberty interest to plaintiff." *Id.*

19

Like the plaintiff in *Doe*, Horse's situation is not analogous to *Vitek*. The consequences from his stigma are unknowable at this time. All of the harms he raises in his complaint are potential harms. He has been moved to a more restrictive environment, but prisoners have no right to avoid incarceration in a higher-security or more restrictive environment. *Freitas v. Ault*, 109 F.3d 1335, 1337 (8th Cir. 1997).

Viewing the facts in the light most favorable to Horse, the Court finds that, as a matter of law, he does not have a protected liberty interest in avoiding the stigma of being designated as a gang member in prison.

## V.   **Pending Discovery**

Horse claims that he cannot produce facts to defeat defendants' motion for summary judgment without completing discovery and argues that he should be allowed to complete discovery before summary judgment is granted. Docket 27 at 1. " '[S]ummary judgment is proper only after the nonmovant has had adequate time for discovery.' " *Nooner v. Norris*, 594 F.3d 592, 599 (8th Cir. 2010) (quoting *In re TMJ Implants Prods. Liab. Litig.*, 113 F.3d 1484, 1489–90 (8th Cir. 1997)). Here, however, even if Horse's discovery requests were granted, it would not help him establish a protected liberty interest.

In *Seltzer-Bey v. Delo*, 66 F.3d 961 (8th Cir. 1995), Seltzer-Bey claimed prison officials violated his Fourth, Fourteenth, and Eighth Amendment rights. The district court granted summary judgment on all three counts. *Id.* at 963. On Appeal, Seltzer-Bey argued that the court should not have ruled on the summary judgment motion while his motions for discovery were pending. *Id.* Because Seltzer-Bey did not identify the facts he sought that would help him oppose summary judgment, the Eighth Circuit found that the district court

20

"acted within its discretion when it decided the defendants' summary judgment motion without compelling the defendants to comply with Seltzer–Bey's discovery requests." *Id.* at 964; *see also Howard*, 129 F.3d at *2 (unpublished) (upholding the grant of summary judgment despite outstanding discovery requests).

Horse has not identified facts he seeks to obtain through discovery that would help him defeat summary judgment. He sent defendants a list of discovery requests in July 2015. Docket 23-2. Horse requests documents concerning policies on confidential informants and kites, the allegations in his complaint, and the NACT as well as the contents of his prison file and the prison's insurance agreements concerning liability. *Id.* None of these would help him establish a liberty interest. Therefore, the Court may grant summary judgment without compelling defendants to respond to Horse's requests.

## CONCLUSION

Defendants move this Court to grant summary judgment. Viewing the facts in the light most favorable to Horse, the Court finds that no reasonable jury could return a verdict in favor of Horse. As a matter of law, none of the four deprivations discussed above establishes a liberty interest to support a claim under the Due Process Clause. Therefore, defendants' motion for summary judgment is granted. Because Horse does not identify facts that would help him defeat summary judgment and nothing in his discovery requests suggests that he would uncover something that would establish a protected liberty interest, it is within the Court's discretion to deny discovery

21

and to grant summary judgment as a matter of law. Accordingly, it is

ORDERED

1. Defendants' motion for summary judgment (Docket 24) is granted.

2. Horse's complaint is dismissed without prejudice.

3. Horse's motion to appoint counsel (Docket 21) is denied as moot.

4. Defendants' motion for protective order (Docket 23) is denied as moot.

Dated this 3rd day of March, 2016.

BY THE COURT:

Lawrence L. Piersol
United States District Judge

ATTEST:
JOSEPH HAAS, CLERK

BY: _____
        DEPUTY

22